FISHER & PHILLIPS LLP
ALLISON L. KHEEL, ESQ.
Nevada Bar No. 12986
300 S. Fourth Street, Suite 1500
Las Vegas, NV 89101
Telephone: (702) 252-3131
Email: akheel@fisherphillips.com

FISHER & PHILLIPS LLP
USAMA KAHF, ESQ. (pending *pro hac vice*)
California Bar No. 266443
2050 Main Street, Suite 1000
Irvine, CA 92614
Telephone: (949) 851-2424
Email: ukahf@fisherphillips.com

*Attorneys for Plaintiff* AssuredPartners of Nevada, LLC

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

|  |  |  |
|---|---|---|
| ASSUREDPARTNERS OF NEVADA, LLC, | ) ) ) | Case No. |
| Plaintiff, | ) ) | **COMPLAINT** |
| vs. | ) ) |  |
| L/P INSURANCE SERVICES, LLC; DEANNA DEHART; COURTNEY PINO; CHRISTOPHER "BRYCE" WARNER; GIGI BRADLEY; and HEATHER PIATT; | ) ) ) ) ) ) |  |
| Defendants. | ) ) ) ) |  |

Plaintiff AssuredPartners of Nevada, LLC ("Assured" or "Plaintiff"), by and through its attorneys, brings this action for damages and injunctive relief against Defendants L/P Insurance Services, LLC and Plaintiff's former employees, Deanna DeHart, Courtney Pino, Christopher "Bryce" Warner, Gigi Bradley, and Heather Piatt (collectively, "Defendants"); and, in support thereof, avers as follows:

FP 41811252.1

*FISHER & PHILLIPS LLP*
*300 S Fourth Street, Suite 1500*
*Las Vegas, Nevada 89101*

## I.   <u>NATURE OF ACTION</u>

1.   After loading two USB devices with hundreds of Assured's Trade Secrets and Confidential Information, Deanna DeHart and Courtney Pino recruited three other valuable Assured employees and put their plan to convert the $2.5 million in Assured accounts they produced and/or serviced to their new employer's benefit, all in violation of their fiduciary duties, their respective restrictive covenant agreements, and, most importantly, state and federal law.

2.   At its core, this is an employee raiding and client poaching case where five employees of Assured coordinated their sudden defection to another insurance agency, L/P Insurance Services, LLC ("LP"), stealing a treasure trove of confidential and trade secret information and poaching clients both before and after resigning from Assured. The employees immediately set out to solicit Assured's clients for the benefit of their new employer, which knew or should have known that each of these employees owed fiduciary and contractual obligations to Assured as each of them had signed confidentiality and non-solicitation agreements as a condition of employment with Assured.

3.   The employees are three producers and two account executives responsible for developing and maintaining client relationships and, until their coordinated move to LP, managed and influenced approximately $2.5 million out of Assured's $3.2 million operation out of its Reno, Nevada office. In taking and retaining Assured's confidential information without authorization, soliciting each other to coordinate a mass departure, communicating with clients in advance of their resignations about their transition to LP, coordinating the timing and manner of their resignations, and immediately soliciting Assured clients, the defecting employees have caused and will continue to cause irreparable harm to Assured.

4.   LP's plan, supported by the former employees' acts of espionage and sabotage alleged in this Complaint, is to try to cripple Assured's ability to maintain its accounts that were produced and/or serviced by these former Assured employees, thereby

FP 41811252.1

backing Assured into a corner and forcing a book sale at a fraction of the genuine value of the business. Predictably, on the third business day after these five employees resigned and joined LP, LP's Vice President of Strategic Growth, who played a central role in coordinating the employees' mass exit from Assured, sent an email to Assured's President (attached hereto as **Exhibit 12**) that read more like a self-serving ransom note – sell us Assured's accounts associated with the former Assured employees or we will steal them.

5.      Assured is a commercial insurance agency specializing in employee benefits and offering a variety of other lines of commercial insurance such as property and casualty and workers' compensation. Assured invested significant time and resources in developing its confidential and trade secret information and its goodwill with clients. As producers and account executives, the Defendant employees developed close personal relationships with many of Assured's clients and learned and had access to the clients' key decision makers, direct contact information, specific needs and preferences, and details of their insurance portfolio, including policy terms, renewal dates, policy limits and coverages, and financial information such as premiums and costs.

6.      This information is valuable to any competitor of Assured as it can be used to identify and target clients at the right time, make it easier for clients to transition their insurance policies to another agency, and underbid Assured's products and services. This is why Assured takes measures to protect its trade secrets, including by limiting access to this information and requiring all employees to sign non-disclosure agreements. To protect its goodwill with clients and significant investment in client relationships, Assured also requires employees to sign agreements restricting them for a period of 24 months after the end of their employment with Assured from soliciting or doing business with Assured clients with whom they had material contact.

7.      Moreover, to protect the stability of Assured's workforce, its ability to continue to support and service clients, and its investments in recruiting, training, and retaining talented producers and client-service employees, Assured requires employees

FISHER & PHILLIPS LLP
300 S Fourth Street, Suite 1500
Las Vegas, Nevada 89101

FISHER & PHILLIPS LLP
300 S Fourth Street, Suite 1500
Las Vegas, Nevada 89101

to sign agreements restricting them for a period after the end of their employment with Assured from soliciting, hiring or recruiting any of Assured's current employees or inducing them to go work for a competitor.

8.      Here, the five employee defendants breached these agreements, and their new employer LP helped them do it. The employee defendants took steps to hide their plan from Assured precisely so they could all strike at once and deprive Assured the opportunity to save and transition client relationships. For example, DeHart lied about going on vacation for two days before she quit her job at Assured without notice and used her supposed vacation time to meet in person with critical clients to ensure that they would immediately transition their business to her when she joined LP. She then resigned from Assured the next morning, and within a day, one of the clients she had just met with on her "vacation" day switched its business to LP, adding that he intended to switch the other entity he controlled to LP too. But DeHart didn't wait for her resignation to start officially moving clients. Indeed, another client she was responsible for actually switched its business to LP two days *before* she resigned, with the applicable carrier noting their surprise at DeHart's lack of pushback or concern over the move.

9.      Similarly, Pino solicited a long-term client of Assured by calling the direct line of the client's key decision maker (which is confidential information of Assured that she unlawfully retained and failed to return) coincidentally while the client was in a meeting with an Assured employee. Although the client declined Pino's call at the time, logic belies any conclusion of the former Assured employee reaching out other than to advise the client of her recent move to LP and to solicit the client's business to move there.

10.      To support these blitz solicitation efforts, the employee defendants improperly retained and failed to return to Assured confidential information they were privy to as a result of their employment with Assured. This includes the direct contact information of Assured clients that the employees stored on their personal cell phones, as well as all text messages they exchanged with clients. By retaining this information on

their personal cell phones while employed by LP in direct competition with Assured, the defendant employees are able to bypass all the time and resources it took to identify and compile all the direct contact information of clients' key decisionmakers (most of which is not easily accessible on the Internet) and to have the benefit of prior correspondence with the clients.

11.    What's worse, three of the employees, DeHart, Pino, and Heather Piatt, all connected USB devices to their Assured computers in the days or weeks before their last day at Assured and copied over 700 files containing Assured confidential and trade secret information. The devices to which these employees copied the files have not been provided to Assured. Among the files they copied to external devices are client lists with extremely valuable information such as the contact information of key decisionmakers, renewal dates, revenue in dollar amounts and percentages; excel spreadsheets identifying and detailing the Reno operation's top revenue-producing clients, activity reports detailing current prospects and their detailed confidential information; and annual active client prospect lists, to name a few. DeHart, Pino, and Piatt were not authorized or permitted to copy any of these files to a personal device not owned or controlled by Assured and were certainly not authorized to then take this information and use it on a competitor's behalf.

12.    In addition, three weeks before she resigned and after DeHart had already clearly switched loyalties to LP, DeHart forwarded a file to her personal Gmail account containing confidential information that several employees of Assured had helped compile pertaining to "key discoveries" learned about a prospective client that the Assured team had met with and to which Assured is or was in the process of submitting a proposal. DeHart was not authorized or permitted to forward any confidential information of Assured to her personal email.

13.    LP is neither a passive beneficiary of the misconduct engaged in by the employee defendants, nor an innocent employer that independently and coincidentally recruited nearly half the staff of a competing agency at the same time. Rather, LP

FISHER & PHILLIPS LLP
300 S Fourth Street, Suite 1500
Las Vegas, Nevada 89101

FP 41811252.1

FISHER & PHILLIPS LLP
300 S Fourth Street, Suite 1500
Las Vegas, Nevada 89101

coordinated the recruitment of all these employees, helped them violate their employee non-solicit restrictions by identifying and recruiting other team members to leave Assured, apparently coached them on what to say in their resignations and how to solicit Assured clients to switch their business to LP, induced their breach of their fiduciary and contractual obligations to Assured, and unfairly benefited from the employee defendants' unlawful conduct. LP is also in possession of improperly acquired trade secrets of Assured by virtue of employing individuals who acquired and retained such information without authorization, especially as these employees stole Assured's trade secrets for the benefit of LP and have begun to use this information for purposes of driving business to LP.

14.     As of the filing of this Complaint, which is a mere three business days since the three producers resigned, Assured has already lost over $144,000 in revenue and six (6) clients that Defendants have unlawfully diverted to LP. And that's just what we know of so far.  Indeed, LP's ransom note claims to be holding "a dozen or so" broker of record letters that would move Assured clients to LP once submitted to the carrier. The damage caused to Assured's goodwill and relationships with the solicitation and loss of these clients is irreparable and no money damages could remedy the harm done. The harm to Assured's goodwill and reputation within the community, and, importantly, its remaining employees is likewise unknown and incalculable. Defendants not only stole Assured's confidential information in anticipation of their mass exit to LP, but they are using that information to actively solicit and divert Assured clients to LP and interfering with Assured's established and contractual relationships with clients.

15.     Faced with irreparable injury from Defendants' course of conduct, Assured seeks injunctive relief to prevent further use and disclosure of its trade secrets, require the return of all confidential information stolen by the Defendants, and enforce the terms of the confidentiality and non-solicitation agreements, as well as compensatory damages and other forms of monetary relief to make it whole.

FP 41811252.1

## II.     **THE PARTIES**

16.     Plaintiff ASSUREDPARTNERS OF NEVADA, LLC ("Assured") is a Nevada limited liability company, and its sole member and owner is AssuredPartners, Capital, Inc., a Delaware corporation with its principal place of business in Lake Mary, Florida. Plaintiff is a citizen of Delaware and Florida by virtue of its sole member being a citizen of those states.

17.     Defendant L/P INSURANCE SERVICES, LLC ("LP") is a Nevada limited liability company with offices in multiple cities and states, including an office in Reno, Nevada. On information and belief, the sole member and owner of LP is BroadStreet Partners, Inc., which is an Ohio corporation with its principal place of business in Ohio. By virtue of its sole member being a citizen of the State of Ohio, LP is a citizen of the State of Ohio.

18.     Defendant DEANNA DEHART ("DeHart") is a citizen of Washoe County, Nevada and an individual residing in the State of Nevada and was employed by Assured from June 9, 2017 until she resigned on September 22, 2021. DeHart's last position held at Assured was Executive Vice President of Sales, Employee Benefits.

19.     Defendant COURTNEY PINO ("Pino") is a citizen of Washoe County, Nevada and an individual residing in the State of Nevada and was employed by Assured from October 16, 2017 until she resigned on September 22, 2021. Pino's last position held at Assured was Sales Executive, Employee Benefits.

20.     Defendant CHRISTOPHER "BRYCE" WARNER ("Warner") is a citizen of Washoe County, Nevada and an individual residing in the State of Nevada and was employed by Assured from March 1, 2019 until he resigned on September 22, 2021. Warner's last position held at Assured was Sales Executive, Employee Benefits.

21.     Defendant GIGI BRADLY ("Bradley") is a citizen of Washoe County, Nevada and an individual residing in the State of Nevada and was employed by Assured from June 9, 2017 until she resigned on September 21, 2021. Bradley's last position held at Assured was Senior Account Executive I, Employee Benefits.

FISHER & PHILLIPS LLP
300 S Fourth Street, Suite 1500
Las Vegas, Nevada 89101

FP 41811252.1

FISHER & PHILLIPS LLP
300 S Fourth Street, Suite 1500
Las Vegas, Nevada 89101

22.     Defendant HEATHER PIATT ("Piatt") is a citizen of Washoe County, Nevada and an individual residing in the State of Nevada and was employed by Assured from June 9, 2017 until she resigned on September 17, 2021. Piatt's last position held at Assured was Account Executive, Employee Benefits.

23.     DeHart, Pino, Warner Bradley, and Piatt are collectively referred to herein as "the Former Employee Defendants."

24.     LP and the Former Employee Defendants are collectively referred to herein as "the Defendants."

25.     Assured is informed and believes and based thereon alleges that at all times herein mentioned, Defendants, and each of them, were acting within the course and scope of their authority as agents, representatives, partners, alter egos and/or employees for the other Defendants, and/or acted with the permission, consent, authorization or ratification of the other Defendants.

### III.     JURISDICTION AND VENUE

26.     The Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. §1331 because this action involves claims asserted pursuant to 18 U.S.C. § 1836 *et seq*.

27.     The supplemental jurisdiction of the Court is invoked pursuant to 28 U.S.C. § 1367 to consider Assured's claims under Nevada statutory and common law and its claims for breach of contract.

28.     Additionally, this Court has subject matter jurisdiction over this action pursuant to 28 USC § 1332 because there is a complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.00, exclusive of interest and costs. The accounts and revenue which are subject to being misappropriated and lost as a result of Defendants' violation of their restrictions and the Defendants' wrongful conduct far exceeds a million dollars.

FP 41811252.1

29.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## IV.      FACTUAL ALLEGATIONS

### A.      Overview of Assured and the AssuredPartners Family of Companies

30.     Assured is among a family of insurance brokerages owned by AssuredPartners, Inc. ("AssuredPartners" and, collectively, the "Assured Group"). AssuredPartners is a national brokerage firm founded in 2011 as a national partnership of leading independent property, casualty, and employee benefits brokerages firms. AssuredPartners has over 180 physical locations across North America and provides insurance services to individuals and businesses in numerous industries, such as aerospace, agriculture, construction, financial services, manufacturing, and real estate, among many others.

31.     Since 2011, AssuredPartners invested heavily in high growth strategies through its successful model of partnering regional insurance brokerages with the resources of a nation-wide family of brokerages, enabling cross-marketing revenue generation and expanding market share through the combined experience and know-how for marketing and business development through hiring, retention, and training of insurance producers who drive revenue. Doing so has enabled AssuredPartners and the Assured Group family of local and regional insurance brokerages to continue to capture market share across numerous lines of insurance products and services throughout the nation.

32.     One such regional partner of AssuredPartners is Assured's Reno, NV operation. Assured's Reno operation has operated since June 9, 2017 throughout the state of Nevada.

33.     On or about June 9, 2017, Assured acquired the insurance brokerage-related assets of Benefit Resource Group LLC. In connection with this acquisition, Assured offered employment to certain of Benefit Resource Group LLC's employees

FISHER & PHILLIPS LLP
300 S Fourth Street, Suite 1500
Las Vegas, Nevada 89101

conditioned upon their entry into restrictive covenants reasonably necessary to protect Assured's legitimate business interests, including not limited to, its trade secrets, confidential business information, client relationships, client goodwill, and employee base. The June 9, 2017 acquisition of Benefit Resource Group LLC is a critical component of Assured's continued success in the west coast region. DeHart, Bradley, and Piatt were among the employees of Benefit Resource Group LLC who were offered and accepted employment with Assured, bringing with them over a decade of experience working with clients. As part of the acquisition, Assured purchased Benefit Resource Group LLC's book of business and continued to work with and service the same clients. Thus, although Assured has only existed for around five years, many of its existing client relationships go back 15 years.

34.     As an insurance brokerage, Assured relies upon and invests heavily in the success of its individual insurance producers. These producers leverage their experience, expertise and AssuredPartners' national resources to generate new business, whether through relationships with new clients or through sales of new lines to existing clients. Repeat business through insurance renewals from existing clients are of paramount importance to the success and growth of Assured. Assured invests in its producers to ensure they continue to nurture and develop the Assured book of business assigned to and/or generated by an individual producer.

35.     Equally critical to Assured's success, however, is Assured's and AssuredPartners' investments into the development and safeguarding of the confidential and trade secret information central to the business platform. Through careful and consistent enforcement of lawful confidentiality policies and contractual obligations and implementing other physical and electronic security measures, Assured and AssuredPartners protect their prized asset – the trade secret and confidential information acquired and developed through continued investment.

36.     Another critical element to Assured's success is its investment in recruiting, developing, training, mentoring, and retaining a stable workforce with the

FISHER & PHILLIPS LLP
300 S Fourth Street, Suite 1500
Las Vegas, Nevada 89101

FP 41811252.1

right staffing balance of producers and account executives. Assured and AssuredPartners have invested significant resources in developing long-term relationships with employees, compensating employees competitively, and working diligently to ensure a happy and satisfying work environment. Employee retention and workforce stability provides Assured's clients with continuity of service and coverage by a dedicated team and helps establish and maintain client loyalty.

**B.    Assured's Trade Secrets**

37.    Assured devotes substantial resources to the protection of information critical to the success of the business where the value of such information depends on it being maintained as confidential and used only for the benefit of Assured. As alleged herein, Assured treats such information as its trade secrets (hereinafter referred to as "**Trade Secrets**" or "**Assured's Trade Secrets**").

38.    Assured's Trade Secrets are all the confidential, proprietary, and/or non-public information, whether or not in a written or recorded form, concerning the business or affairs of Assured and/or the Assured Group, where such information qualifies as a trade secret under applicable law. Assured's Trade Secrets include, but are not limited to, for example:

a.    The Assured Group's clients, prospective clients, acquisition targets, insurance brokers, vendors, insurance carriers, policy forms and information, policy types, rating information, premium amounts, expiration dates, information on risk characteristics, information concerning insurance markets for large or unusual risks and/or contracts or arrangements (including special terms and deals);

b.    the Assured Group's financial condition, results of operations, marketing plans, business plans, operations, pricing, promotions, and business strategies and methods; and

c.    the services and products offered by Assured to its clients or prospective clients, including but not limited to, policy forms, rating information,

FISHER & PHILLIPS LLP
300 S Fourth Street, Suite 1500
Las Vegas, Nevada 89101

expiration dates, information on risk characteristics, and information concerning insurance markets for large or unusual risks.

39.     Assured developed, compiled, or acquired its Trade Secrets at great expense and through substantial efforts over many years of work. Assured Trade Secrets are not readily ascertainable in the insurance industry or in any type of trade or public directory or any other source.

40.     For example, the identity and direct (non-publicly listed) contact information of key decision-makers of Assured corporate clients responsible for purchasing insurance products and services, along with compilations of this information, would be valuable information to Assured competitors. This information in the hands of a competitor would enable the competitor to limit or negate costly marketing and promotional strategies designed to locate this very information and solicit business from the right individuals at businesses with a proven need or desire for certain types of insurance products.

41.     As another example, insurance pricing information, renewal dates and histories, claims data, additional underwriting criteria, and other information unique to a client likewise would be extremely valuable to a competitor seeking to solicit the particular client. Further, Assured has a duty to the client to keep such information confidential.

42.     The misuse of Assured Trade Secrets, whether through the improper disclosure or improper use for a non-Assured business purpose, would cause significant damage to Assured through potential loss of business and business opportunity, loss of goodwill, loss of employees through unfair and unlawful means, damage to reputation, and other types of harm.

43.     As such, Assured takes careful, deliberate actions at great expense to protect against the misuse or wrongful disclosure of Assured Trade Secrets. Assured has taken steps reasonable under the circumstances to maintain the secrecy of its Trade Secrets, such as: (a) emphasizing to employees Assured's need to keep this information

FISHER & PHILLIPS LLP
300 S Fourth Street, Suite 1500
Las Vegas, Nevada 89101

FP 41811252.1

FISHER & PHILLIPS LLP
300 S Fourth Street, Suite 1500
Las Vegas, Nevada 89101

a secret; (b) requiring, as a condition of employment that all employees promise not to use or disclose this information except in the performance of their duties for Assured; (c) having employees execute confidentiality and non-disclosure agreements that instruct Assured's employees not to disclose, reproduce or use this information without Assured's consent; (d) distributing confidentiality polices to all employees through company handbooks the receipt for which must be "acknowledged" by the employee; (e) limiting access and/or restricting access to this information by employees on a need-to-know basis; (f) requiring unique usernames and passwords to access Trade Secrets on Assured's computer systems and databases; and (g) implementing a number of physical and electronic security measures, including restricting access to databases and network space, assigning passwords and user-level permissions to access information on Assured's computer system, servers, and networks, encrypting Assured laptops issued to employees, and requiring that Trade Secrets be kept in secure locations when not in use.

44.    For example, the employee handbook used by Assured in 2021 obligates all Assured employees to specifically acknowledge, and be bound by, provisions identifying in detail the nature of Assured Trade Secrets and obligating employees to protect such information. Assured's Handbook states in pertinent part:

> To protect our interests in these Trade Secrets and Confidential Information, you must (a) not use any such Trade Secrets and Confidential Information for your personal benefit or for the benefit of any person or entity other than us, and (b) use your best efforts to limit access to such Trade Secrets and Confidential Information to those who have a need to know it for our business purposes. In addition, you should minimize those occasions on which you take documents, computer disks, storable media or devices containing such Trade Secrets and Confidential Information outside the office. On those occasions where it is necessary, consistent with the best interests of the Company and doing your job effectively, to take such Trade Secrets and Confidential Information outside the office, all appropriate precautionary and security measures should be taken to protect the confidentiality of the information. An employee shall

A copy of the pertinent pages of this Handbook is attached hereto as **Exhibit 1**.

45.    Further, as part of Assured's efforts to protect its Trade Secrets, Assured does not allow insurance producers access to Assured Trade Secrets until after the producer executes a written confidentiality agreement whereby producers acknowledge they will have access to Assured Trade Secrets, promise not to disclose Assured Trade

FISHER & PHILLIPS LLP
300 S Fourth Street, Suite 1500
Las Vegas, Nevada 89101

Secrets to anyone not authorized to receive it, and to confirm they will not use Assured Trade Secrets except for legitimate business purposes for the benefit of Assured. Producers also agree that confidentiality obligations survive the termination of their employment relationship with Assured, that they will continue to treat Assured's Trade Secrets as confidential, that they will not disclose Assured's Trade Secrets to any third party, and that they will not retain Assured Trade Secrets.

46.     Assured also protects the confidentiality of its Trade Secrets by enforcing its contracts respecting the confidentiality of its Trade Secrets. Assured does not tolerate violations of confidentiality provisions such as the ones described above and takes steps to enforce its rights, from cease and desist letters to litigation seeking emergency or preliminary and permanent injunctive relief, when, for example, producers violate their employment and post-employment confidentiality obligations.

47.     Because of the nature of the Trade Secrets, Assured's commitment to enforce its confidentiality agreements, the fact that the Trade Secrets derive value by virtue of being confidential, and the fact that the Trade Secrets cannot be obtained from public sources by competitors, Assured's Trade Secrets are trade secrets under federal law.

48.     In the course and scope of their duties for Assured, the Former Employee Defendants had access to, regularly used, and were responsible for maintaining and safeguarding Assured's Trade Secrets from use and disclosure for a competitive purpose.

**C.     Assured's Confidential Information**

49.      Further, to the extent Assured's Trade Secrets do not qualify as trade secrets under applicable state or federal law, such information is still protected as confidential information under applicable law and/or contracts signed by the Former Employee Defendants (hereinafter referred to as "**Confidential Information**" or "**Assured Confidential Information**").

50.     Assured Confidential Information encompasses all information belonging to Assured other than Trade Secrets (as defined above) that is proprietary and confidential

in nature, whether the information is reduced to writing or in a form from which such information can be obtained, translated or derived into reasonably usable form, and whether the information is simply in an employee's head, that: (a) has been provided to the employee during his/her employment with Assured; (b) the employee has gained access to while employed by Assured; and/or (c) was developed by the employee in the course of his/her employment with, and on behalf of, Assured.

51.   Examples of Assured Confidential Information include, but are not limited to:

a.   information believed by Assured to be a Trade secret (as defined above) that ultimately does not qualify as a trade secret under applicable law but nonetheless was maintained by Assured as confidential;

b.   the non-trade secret but still proprietary or confidential methodologies, strategies, programs, and systems used by Assured in managing assets, liabilities, and risk and/or in soliciting, marketing, selling and providing services to its clients;

c.   private and confidential communications with Assured's clients, vendors, insurance carriers, and consultants;

d.   non-trade secret but still confidential or private information of third parties that Assured has contractual and/or legal obligations to maintain as confidential, including all client information that Assured and its employees are restricted from disclosing by federal, state or local statutes or regulations;

e.   non-trade secret but still proprietary or confidential financial and accounting information of Assured;

f.   non-trade secret but still proprietary or confidential information concerning Assured's current and prospective clients and vendors (including, but not limited to, information that clients and vendors expect Assured to keep as confidential);

FISHER & PHILLIPS LLP
300 S Fourth Street, Suite 1500
Las Vegas, Nevada 89101

- 15 -

FP 41811252.1

FISHER & PHILLIPS LLP
300 S Fourth Street, Suite 1500
Las Vegas, Nevada 89101

g.      non-trade secret but still proprietary or confidential information concerning Assured's consultants, independent contractors, and vendors (including lists of all the foregoing); and

h.      personnel files and employment-related records of Assured's current and former employees (including, but not limited to, information related to the hiring, recruitment, retention, and termination of its current and former employees, as well as information related to their job duties, assignments, skills, training, performance, discipline, promotions, compensation, benefits, leaves of absence, and medical files).

52.     Information received from a third party under contractual confidentiality obligations is valuable to Assured for a number of reasons regardless of its trade secret status, including that disclosure or use of this information in violation of the contract with the third party may subject Assured to legal liabilities, destroy the relationship with that third party, and deprive Assured of all the benefits of its investment in that relationship. This information would also be valuable to a competitor if it is obtained or acquired by the competitor without any contractual obligation associated with the information as it would be tantamount to free discovery of information and permit the competitor to bypass the expenditure of significant time and resources to develop, compile or obtain this information.

53.     As with its Trade Secrets, Assured takes the same reasonable measures to protect against the misuse and wrongful disclosure of Assured Confidential Information. These measures include, but are not limited to: (a) emphasizing to employees Assured's need to keep this information confidential; (b) requiring, as a condition of employment that all employees promise not to use or disclose this information except in the performance of their duties for Assured; (c) having employees execute confidentiality and non-disclosure agreements that instruct Assured's employees not to disclose, reproduce or use this information without Assured's consent; (d) distributing confidentiality polices to all employees through company handbooks the receipt for which must be "acknowledged" by the employee; (e) limiting access and/or restricting

FP 41811252.1

access to this information by employees on a need-to-know basis; (f) requiring unique usernames and passwords to access Confidential Information on Assured's computer systems and databases; and (g) implementing a number of physical and electronic security measures, including restricting access to databases and network space, assigning passwords and user-level permissions to access information on Assured's computer system, servers, and networks, encrypting Assured laptops issued to employees, and requiring that Confidential Information be kept in secure locations when not in use.

54.     In the course and scope of their duties for Assured, the Former Employee Defendants had access to, regularly used, and were responsible for maintaining and safeguarding Assured's Confidential Information from use and disclosure for a competitive purpose.

**D.     The Former Employee Defendants' Contractual Obligations to Assured**

55.     **DeHart**, **Bradley**, and **Piatt** were each former employees of Benefit Resource Group LLC who accepted employment with Assured as part of its June 9, 2017 acquisition. In so doing, they each entered into materially identical Employment and Restrictive Covenants Agreements with Assured binding themselves to contractual obligations to protect their employer's confidential, trade secret information and not use or disclose that information for purposes other than the legitimate business purposes of the employer. True and correct copies of Assured's Employment and Restrictive Covenants Agreements with DeHart, Bradley, and Piatt are attached hereto as **Exhibits 2, 3, and 4**, respectively, and collectively referred to herein as the "**DeHart/Bradley/Piatt Restrictive Covenants Agreements**."

56.     As a condition of employment with Assured, DeHart, Bradley, and Piatt each agreed that they would not use or disclose any "Confidential Information" for "any reason other than as intended within the course" of their employment or as approved by an executive officer of Assured, and upon separation of employment they would

FISHER & PHILLIPS LLP
300 S Fourth Street, Suite 1500
Las Vegas, Nevada 89101

FP 41811252.1

immediately return all documents, materials, and data relating to the business of Assured.

Paragraph 2 of the DeHart/Bradley/Piatt Restrictive Covenants Agreements provides:

2.   *Confidential Information*.

2.1.   For purposes of this Agreement, the term "Confidential Information" means all confidential, proprietary, and/or non-public information, whether or not in a written or recorded form, concerning the business or affairs of the Company, including but not limited to, information concerning:

2.1.1.   the Company's clients, prospective clients, acquisition targets, vendors, insurance carriers, policy forms, rating information, expiration dates, and/or contracts or arrangements (including special terms and deals);

2.1.2.   the Company's financial condition, results of operations, marketing plans, business plans, operations, pricing, promotions, and business strategies and methods; and

2.1.3.   the services and products offered by the Company to its clients or prospective clients, including, but not limited to, policy forms, rating information, expiration dates, information on risk characteristics, and information concerning insurance markets for large or unusual risks.

2.2.   Employee acknowledges and agrees that all Confidential Information is the sole and exclusive property of the Company. Accordingly, both during and after employment with the Company (whether such separation from employment is voluntary or involuntary, or with or without cause), Employee shall not use, or disclose to any third party, any Confidential Information for any reason other than as intended within the scope of Employee's employment or as approved by an executive officer of the Company in writing. Upon separation of employment for any reason, or at any other time upon request of the Company, Employee shall immediately deliver to the Company all documents, materials, and data (and copies thereof), in tangible, electronic, or intangible form, relating to the business of the Company.

57.   As a further condition of employment with Assured, DeHart, Bradley, and Piatt each agreed that they would neither solicit nor interfere with Assured's relationships with its employees and clients. Paragraph 3 of DeHart/Bradley/Piatt Restrictive Covenants Agreements provides:

3.   *Non-Solicitation & Non-Interference*.

3.1.   Except on behalf of the Company, during Employee's employment with the Company and for twenty-four (24) months after Employee's employment ends with the Company (whether voluntary or involuntary or with or without cause), Employee shall not directly or indirectly through another person or entity:

3.1.1.   offer, sell, solicit, quote, place, provide, renew, or service any insurance product or service to, or on behalf of, any Restricted Client;

3.1.2.   take any action intended, or reasonably likely, to cause any vendor, insurance carrier, wholesale broker, Restricted Client, other client of the Company, or any other third party with a material business relationship with the Company to cease or refrain from doing business with the Company; or

3.1.3.   solicit, hire, engage, or seek to induce any of the Company's employees to terminate such employee's employment with the Company for any reason, including, without limitation, to work for Employee or a competitor of the Company.

FISHER & PHILLIPS LLP
300 S Fourth Street, Suite 1500
Las Vegas, Nevada 89101

3.2.   *Restricted Clients.*  For purposes of this Agreement, "<u>Restricted Client</u>" means the following:

    3.2.1.  any client of the Company during the two (2) years immediately preceding the date upon which Employee's employment with the Company ends for any reason (the "<u>Separation Date</u>") as to which the Employee either had some involvement in proposing, selling, quoting, placing, providing, servicing, or renewing any insurance product or service or about whom the Employee received Confidential Information; or

    3.2.2.  any prospective client of the Company within two (2) years immediately preceding the Separation Date as to which Employee had involvement in proposing, selling, quoting, placing, providing, servicing, or renewing any insurance product or service or about whom Employee received Confidential Information.

3.3.   *Enforcement.*  In the event of the breach or a threatened breach by Employee of any of the obligations of <u>Section 3.1</u> above, the Company, in addition to other rights and remedies existing in its favor, shall be entitled to injunctive relief and may apply to any court for specific performance, temporary, preliminary, and/or permanent injunctive relief, or other relief in order to enforce the obligations or prevent any violations of the obligations.  In addition, in

the event of an alleged breach or violation by Employee of the obligations in <u>Section 3.1</u>, the Restricted Period shall be tolled until such breach or violation has been cured.

58.   In Paragraph 14 of the DeHart/Bradley/Piatt Restrictive Covenants Agreements, they each agreed that the contract would be governed by Nevada law.

59.   In Paragraph 18 of the DeHart/Bradley/Piatt Restrictive Covenants Agreements, they each agreed that Assured would be entitled to recover its attorney's fees and expenses should it be required to enforce their agreements for breach or threatened breach:

18.   **Attorneys' Fees.**  If the Company engages one or more attorneys to enforce any of the terms of this Agreement or otherwise protect the Company against any breach or threatened breach of this Agreement, whether or not a lawsuit or claim is actually filed, Employee shall be responsible for all of the Company's actual attorneys' fees, costs, and expenses, and all other reasonable costs and expenses, in addition to any other legal or equitable relief to which the Company may be entitled.

60.   As a condition of their employment with Assured, Warner and Pino also executed Restrictive Covenants Agreements. The terms of those Agreements are similar to those of the DeHart/Bradley/Piatt Restrictive Covenants Agreements and are attached hereto as **Exhibits 5 and 6**, respectively. The non-solicitation and non-disclosure provisions in Warner's and Pino's agreements are slightly different from those of the DeHart/Bradley/Piatt Restrictive Covenants Agreements, but also prohibit them from directly or indirectly soliciting the same substantive set of Assured clients and soliciting or inducing current employees of Assured or the Assured Group to leave their

FP 41811252.1

FISHER & PHILLIPS LLP
300 S Fourth Street, Suite 1500
Las Vegas, Nevada 89101

employment, as well as from using, disclosing, or retaining key, non-public Assured information. See Warner and Pino Agreements, ¶¶ 2-3.

61.     All of the Former Employee Defendants' Restrictive Covenant Agreements are collectively referred to herein as "the Agreements."

**E.     Defendants Conspire to Coordinate a Mass Defection to LP**

62.     Starting in 2020, Assured began implementing changes in its management of producers with a focus on accountability and sales goals to counteract that normal annual attrition of accounts that would eventually cause an operation to atrophy. As a result, several producers at the Reno office, including DeHart, Pino, and Warner – who were each very good at maintaining client relationships and retaining the associated business – became complacent and comfortable with simply maintaining Assured's existing clients. Assured management set out to change this mindset and in November 2020, it required all producers, including DeHart, Pino, and Warner, to sign "2021 Producer Commitment" letters acknowledging and committing to a sales goal for 2021 and agreeing that if the producer does not bring in a minimum of $50,000 in new business in 2021, their commission rate *may* be reduced starting in 2022. Assured management held monthly one on one meetings with each producer to check in on their progress in achieving their annual goals and to discuss their plans and what support they need to meet their goals. These monthly meetings have continued through the present.

63.     DeHart, Pino, and Warner did not react well to Assured's efforts to hold them accountable to sales goals by growing Assured's client base. They were unhappy with these changes. So, they began to look for a way out, another agency where they could rest their laurels on the $2.5 million in business they managed and influenced on behalf of Assured.

64.     In June and July 2021, an insurance executive named Brian Cushard ("Cushard") working for a long-time competitor of Assured, Defendant LP, who concentrates in "acquisitions" on behalf of LP, met personally with DeHart. LP's February 13, 2020 press release on his hire states what his "concentration" was:

### LP Insurance Services, LLC. Welcomes Brian Cushard

**February 13, 2020**

RENO, Nev. February 13, 2020 – LP Insurance Services, LLC proudly welcomes Brian Cushard as Vice President Strategic Growth.

A native of Sacramento, Cushard is a graduate of the University of Southern California and currently resides in Reno, Nev. As Vice President Strategic Growth, Cushard concentrates on acquisitions, operational enhancements and growth throughout LP Insurance Services.

65.    Upon information and belief, in June and July 2021, LP and DeHart began conspiring to jointly recruit a team of insurance professionals from Assured, both producer and account managers, to work for LP and to unlawfully solicit, transfer, and then service as many accounts as they could transfer. On July 14, 2021, DeHart and Cushard had lunch.

66.    On July 16, 2021, all underperforming producers at Assured's Reno operation, which included DeHart, Pino, and Warner, were invited to a Mid-Year Producers Meeting and asked to complete a report in preparation for the meeting. At this time, DeHart, Pino, and Warner were all at less than 50% of their goals for the year. This meeting was an effort to push the producers to be more proactive and focus on activities that help them achieve their sales goals.

67.    On July 21, 2021, Assured management held a meeting with DeHart, Pino, and Warner to hear them out about their recent frustrations with Assured's focus on growth objectives and accountability. During this meeting, the sales team discussed, among other things, the handling of a particular prospect. As alleged below, DeHart later forwarded to her personal email a confidential document pertaining to this prospect after she had already been recruited by LP.

68.    On August 4, 2021, Assured management again held virtual meetings with underperforming producers, including DeHart, Pino, and Warner, to discuss how to finish out the year and meet goals. DeHart, Pino, and Warner were unhappy with Assured's continued efforts to push them to achieve reasonable sales objectives, as they just wanted to maintain the current book of business they produced and serviced.

FP 41811252.1

FISHER & PHILLIPS LLP
300 S Fourth Street, Suite 1500
Las Vegas, Nevada 89101

69.     DeHart and Pino channeled their unhappiness into action a mere three days later. Specifically, on August 7, 2021, DeHart and Pino both connected external devices through USB to their Assured computers around the same time and proceeded to copy over 700 files containing Assured's Trade Secrets and Confidential Information, as alleged in more detail below.

70.     Upon information and belief, DeHart and Pino then conspired with LP to solicit Bradley to join their conspiracy in early August 2021, by suggesting that Cushard reach out to Bradley and telling him about her as a valuable team member they would like to work with at LP.

71.     Specifically, on August 9, 2021, Cushard reached out to Bradley through LinkedIn, stating: "I'm part of the executive team here at LP and we are looking for great people support our community relationship goals. I've heard wonderful things about you from various people here. Would you be interested in having coffee sometime?" Bradley declined the solicitation at that time, and on August 10, 2021, Cushard replied on LinkedIn: "Assured Partners is lucky to have you. Good luck with all of your endeavors!"

72.     On August 16, 2021, Caparso emailed all producers at the Reno office a new producer compensation agreement reflecting revised terms of the producers' annual new business goal and the consequences for not meeting this goal, as well as more details regarding splits with other offices, emerging producer splits, and referral fees. Caparso and Osborn also held a virtual meeting the same day with the producers to review the new agreement with them and answer their questions. DeHart was on a leave of absence on this day and did not attend the meeting.

73.     On August 30, 2021, DeHart forwarded from her Assured email account to her personal Gmail account a document pertaining to the prospective client discussed with Assured management at the meeting on July 21, 2021. This is alleged in further detail below.

74.     On September 1, 2021, DeHart emailed Assured's Regional Director of Human Resources, Lauren Horsman, asking: "Will you please send me a copy of all of

FISHER & PHILLIPS LLP
300 S Fourth Street, Suite 1500
Las Vegas, Nevada 89101

the documents that I have signed (going back to when we were Benefit Resource Group until now if possible?)?"

75.     On September 7, 2021, Caparso emailed DeHart reminding her to sign the new producer agreement that was presented to her on August 16, 2021. Most producers had signed their new agreements by that point, but DeHart had reservations about it due to the negative consequences to her commissions if she does not bring in the required minimum of new business each year. She responded to Caparso asking to discuss this agreement when they meet next in a couple of days.

76.     On September 9, 2021, Caparso and Assured's Chief Operating Officer, Cynthia Osborn, met with DeHart to discuss DeHart's future at Assured and her willingness to sign a new a producer agreement in which she would be required to meet the goal of developing $50,000 in new business annually. Caparso and Osborn expressed that they knew she was still struggling and unhappy and did not like the pressures of a sales goal. DeHart suggested that she was considering leaving at that meeting. In light of that news, DeHart, Caparso and Osborn discussed potential options for DeHart if she did decide to leave Assured – none of which included joining an established competitor, taking Assured confidential and trade secret information and employees, and then using such information to poach Assured accounts.

77.     DeHart followed up on that meeting the next day, September 10, 2021, by email acknowledging that, whatever she chose to do going forward, she would be bound by the restrictive covenants in her agreement: "I am relieved to know that I don't have a non compete and that it is actually an option for me to continue my career as a broker (while of course honoring my restrictive covenants)."

78.     A few hours after DeHart sent her September 10, 2021 email described above, Cushard invited Bradley to connect with him on LinkedIn. This was the second time Cushard reached out to Bradley on LinkedIn, as she had turned down his attempt to recruit her through LinkedIn on August 9, 2021. But by September 10, 2021, it seems she was now suddenly interested in connecting with Cushard or had already met with

him. And on September 11, 2021, Bradley inexplicably canceled an unusual number of future personal appointments she had entered into her work calendar as though she was getting ready to leave Assured and wanted to make sure her personal appointments are off her Assured calendar.

79.     On September 13, 2021, DeHart attended a virtual meeting with Caparso and Osborn. Caparso asked DeHart to confirm that she read her Restrictive Covenants Agreement, and DeHart replied, "yes and it's a hell of a thing." She asked if she could "buy her book," and Caparso said that Assured was not interested in selling its accounts. DeHart responded with words to the effect of, "that makes sense since Assured is in growth mode and doesn't want to go backwards."

80.     On September 16, 2021, DeHart emailed Osborn stating that she and her husband are going out of town to Almanor (which is over two hours' drive from Reno, Nevada) from the afternoon on Friday September 17 through the following Tuesday September 21, 2021 because they "need to spend some time together." She wrote: "I'm always available by phone if someone needs me of course, but otherwise I am going to take a couple of days." Upon information and belief, DeHart's supposed travel plans and the length of same were a cover story, used to prevent Assured from discovering that DeHart was, in fact, planning to use at least some of that time to meet with Assured clients to inform them of her plans to move to LP and to start soliciting the transfer of their business to LP. As described below, her own emails indicate that DeHart met in person with clients in Reno on the days she was supposed to be over two hours away.

81.     On September 16, 2021, Bradley sent an invite for lunch on September 21, 2021 to all account executives at Assured's Reno operation except one. As alleged below, this is the lunch at which Bradley announced to the account executives her resignation before submitting her resignation to Assured management. Bradley took the unusual step of marking this invitation as "private" which prevented Osborn and other managers from finding out about it at the time and seeing who was invited. Thus, based on this invitation being sent in this manner on September 16, Bradley had already decided

FP 41811252.1

FISHER & PHILLIPS LLP
300 S Fourth Street, Suite 1500
Las Vegas, Nevada 89101

by at least September 16, if not sooner, that she was going to resign on September 21, 2021.

82.   On September 16, 2021, the day before she resigned as alleged below, Piatt sent a calendar invite for a virtual meeting to a client that she and Pino were working with. However, Piatt sent this invitation to Pino's personal email, courtpino@gmail.com. There was no legitimate business reason for Piatt to send this meeting invitation to Pino's personal email.

83.   ***The First Resignation:*** On Friday, September 17, 2021, at 4:42 pm, Piatt emailed Assured's COO, Osborn, a resignation notice. Of course, it was unknown to Assured at the time that Piatt's resignation notice was merely the first of the five Former Employee Defendants – all of whom submitted resignations over the next five days. Piatt refused to identify her new employer but offered a two-week notice period before she left "in order to pursue a new career opportunity." A true and correct copy of Piatt's September 17, 2021 resignation notice is attached hereto as **Exhibit 7**.

84.   Assured's COO, Osborn, made several attempts to speak with Piatt the same day after she resigned, but Piatt did not reply through the weekend. Osborn then spoke with Bradley and Bradley disclosed that Piatt was going to work for LP.

85.   On Sunday, September 19, 2021, Bradley emailed Regional Director of Human Resources Lauren Horsman to ask, like DeHart did, for the "signed/fully executed agreements you have on file for me," ostensibly because she had happened upon only unsigned versions when she was "cleaning out and organizing" her home office.

86.   On Monday, September 20, 2021, at 7:44am, Piatt sent an email to DeHart to follow up on items from a recent client meeting. In this email, Piatt tells DeHart that she cannot work on these items after October 1 as that will be her last day and then she is going on vacation October 3rd through the 10th. Piatt had just resigned late afternoon on Friday September 17, 2021, and her resignation had not been communicated to anyone by management, and yet the language and tone of this email indicates that DeHart already

FISHER & PHILLIPS LLP
300 S Fourth Street, Suite 1500
Las Vegas, Nevada 89101

1   knew Piatt had resigned as Piatt did not state in the email that she had resigned, only that
2   her last day will be October 1st.

3       87.     On September 20, 2021, the day she had claimed to be on "vacation" with
4   her husband, DeHart changed her recovery email that is linked to her personal Google
5   account from her Assured work email address to her personal Gmail account.
6   Notification from Google of this change was sent to her Assured email account.

7       88.     ***The Second Resignation:*** Two business days after Piatt resigned, on
8   Tuesday, September 21, 2021, around 3pm, and after informing other account executives
9   of her resignation over lunch that day, Bradley emailed Assured's COO her two-week
10  resignation notice. She, too, wrote of her new career opportunity: having "decided to
11  accept an offer for an opportunity that is too exciting for me to decline." A true and
12  correct copy of Bradley's resignation notice is attached hereto as **Exhibit 8**.

13      89.     ***The Third, Fourth, and Fifth Resignations:*** On Wednesday, September
14  22, 2021, around 7am, DeHart and Pino arrived together at the office with boxes of
15  equipment that they walked in and dropped off before emailing their resignation at
16  exactly the same minute, 7:19am, and then walking out with them unknown items from
17  Assured's offices. They were presumably not expecting to see anyone that early in the
18  morning at the office, but Assured's COO, Osborn, happened to be there for a call;
19  Osborn arrived before they did around 6:45am. Osborn was unable to interrupt her call
20  when they arrived at the office, but she saw DeHart and Pino arrive together, and they
21  saw each other. Osborn was able to speak with them briefly after her call was over and
22  as they were headed out the front door. Osborn asked them where they were going and
23  what was going on and were they all going to LP. DeHart responded, "I think I'm
24  restricted from sharing where I'm going per my agreement with the new employer."
25  Osborn then asked Pino to stay a minute and she spoke with her after DeHart left. Osborn
26  asked Pino if she would consider staying at Assured. Pino said she was set on leaving
27  and her mind was made up. She did confirm she was going to LP.

28

FISHER & PHILLIPS LLP
300 S Fourth Street, Suite 1500
Las Vegas, Nevada 89101

90.     Minutes before sending her resignation email, DeHart emailed an Assured employee who works remotely some words of encouragement. She then left similar notes for all other employees in the office except Piatt, Bradley, Pino, and Warner. This was before she sent her resignation email at 7:19am that morning and more than four hours *before* Warner submitted his resignation.

91.     DeHart's and Pino's resignations, which they both emailed to Osborn at 7:19am on September 22, 2021, were "**effective immediately**." True and correct copies of their resignation notices are attached hereto as **Exhibits 9 and 10**.

92.     Later the same morning, at 11:57am Wednesday September 22, 2021, Warner emailed Osborn his resignation also "**effective immediately**." A true and correct copy of Warner's resignation notice is attached hereto as **Exhibit 11**.

93.     Not by coincidence, all three expressed their supposed desires to "purchase their books". DeHart wrote, "***I would still like to pursue a course to buy my book***." Exhibit 9 (emphasis added). Pino explained, "***I would be interested in purchasing my book of accounts and look forward to your response regarding this request.***" Exhibit 10 (emphasis added). And Warner expressed that he "***would like to purchase my book of accounts. Please let me know at your earliest convenience your thoughts on that.***" Exhibit 11 (emphasis added).

94.     The following day, on September 23, 2021, LP issued a Press Release welcoming DeHart, Pino, and Warner.

95.     On September 23, 2021, Assured informed Piatt and Bradley that they were released effective September 23. Turns out this was a prudent choice, as Piatt had been using a USB device to steal Assured's Trade Secrets and Confidential Information from September 20, 2021 through the time her access was cut off on the night of September 23, 2021. Specifically, Piatt stole, among other things, confidential documents pertaining to specific clients the Defendants plan to solicit, or already have solicited, on behalf of LP. All such activity took place after Piatt's September 17 resignation and the

FISHER & PHILLIPS LLP
300 S Fourth Street, Suite 1500
Las Vegas, Nevada 89101

FP 41811252.1

USB device used was not returned to Assured with Piatt's other equipment when she dropped her Assured items off on September 24, 2021.

**F.** **Assured Lost Over $80,000 In Annual Revenue Within Two Business Days As a Result of Defendants' Unlawful Solicitations That Began Before They Even Resigned**

96.     Assured's investigation is ongoing, but it is clear that the Former Employee Defendants had solicited clients to transfer their insurance business to LP even before they had resigned.

97.     ***The Former Employee Defendants' Pre-Resignation Solicitations.*** Prior to announcing her resignation on September 23, DeHart was already soliciting clients:

a.     On September 16-17, 2021, DeHart met with a client and exchanged emails with Piatt about action items for this client including renewal decisions.

b.     On September 20, 2021, one of the Assured clients that DeHart was responsible for executed a broker-of-record letter transferring business from Assured to LP. When Assured learned of this, an Assured employee contacted the insurance carrier on the policy who explained that the carrier had spoken with DeHart the night of September 20 and that DeHart was unexpectedly dismissive by the loss of business, with words to the effect of "I guess we win some and we lose some" – which the carrier noted was extremely uncharacteristic of her. DeHart failed to inform anyone on her team at any time before her resignation regarding the loss of this client, and she failed to take any action to try and save the relationship. As her workers she left behind at Assured would attest, if DeHart was losing a client, she would typically jump in and do everything she could to salvage the relationship and find out why the client is leaving, and for her to simply dismiss it is completely out of character for her. DeHart had no reason to push the panic button, as this client was simply moving with her to LP. Assured's loss of annual revenue on this client is **$28,476.26**, in addition to the irreparable loss of client goodwill.

FISHER & PHILLIPS LLP
300 S Fourth Street, Suite 1500
Las Vegas, Nevada 89101

FISHER & PHILLIPS LLP
300 S Fourth Street, Suite 1500
Las Vegas, Nevada 89101

c.      On Monday September 20, 2021, one of DeHart's supposed "vacation" days, DeHart emailed a client to schedule a meeting for the following day – also another supposed "vacation day"; DeHart writes: "How about if I grab us a couple of coffees & swing by your office first thing in the morning? I'd like to go over your benefits in detail with you & answer an immediate questions you have. Can that work? If so, please let me know what kind of coffee drink you'd like. ☺" Upon information and belief, DeHart did, in fact, meet with this Assured client on September 21, 2021 and solicited this client for the benefit of LP. Moreover, DeHart and Piatt both accessed and stole through a USB device Trade Secrets and/or Confidential Information pertaining to this client in the days or weeks before they resigned but after they had already decided to join LP. If DeHart is successful in diverting this client to LP, Assured would suffer a loss of over **$30,000** in annual revenue, in addition to the irreparable loss of client goodwill.

d.      On Tuesday September 21, 2021, also one of DeHart's supposed "vacation" days, DeHart emailed an Assured producer about another Assured client, writing, "I'm going to pop by [the client's] office and handle it today. It's a great renewal so it should be easy for them. I'll let you know what they decide." Upon information and belief, DeHart did, in fact, meet with this Assured client on September 21, 2021 and solicited this client for the benefit of LP. DeHart was successful in this effort, as only one day later, September 22, 2021, this client switched not just its business to LP, but also the business of an affiliated company that is also an Assured client DeHart was responsible for and was working on renewal policies for shortly before her resignation. Assured's loss of annual revenue on both these clients is **$26,323.60**, in addition to the irreparable loss of client goodwill.

98.     Prior to announcing her resignation on September 23, Pino was already soliciting clients. For example, on Monday September 20, 2021, less than 48 hours before she resigned, Pino emailed a prospective client to confirm their meeting on Thursday September 23, 2021, which Pino knew at the time was going to be her first day of

FP 41811252.1

employment with LP. Upon information and belief, Pino did, in fact, meet with and solicit this Assured prospective client on September 23, 2021.

99.     Further, on September 22, 2021, the day that DeHart, Pino, and Warner submitted their resignations, Piatt emailed an insurance carrier requesting "all the summaries" for an Assured client that Pino solicited directly on September 22, 2021, as alleged below.

100.     ***After Resigning, the Former Employee Defendants Continued to Solicit Assured Clients.*** Assured is so far aware of at least the following solicitations by one or more of the Former Employee Defendants:

a.     On September 23, 2021, the day of her resignation, DeHart forwarded a broker-of-record letter to an Assured client, writing: "All you need to do is print the attached letter, sign it and return it to me. I will submit it to the carriers on your behalf. If you don't mind sending me the most recent copy of your invoices from each carrier, that will help to expedite the process." The next day, the client inadvertently sent the signed broker-of-record letter dated September 23, 2021 to DeHart's Assured email address. DeHart was successful in soliciting and diverting this client, resulting in annual revenue loss to Assured of **$26,978.20**.

b.     On September 24, 2021, upon information and belief, DeHart and Warner attended a previously scheduled client meeting that was originally scheduled for the benefit of Assured. Upon information and belief, this is the same client that DeHart emailed on September 20, 2021 and met with on September 21, 2021 as alleged above, for which Assured's annual revenue is over $30,000.

c.     On September 24, 2021, while an Assured employee was meeting in-person with a client, the client received a call on her cell phone from Pino. Upon information and belief, this was an attempt by Pino to solicit this client. If Pino is successful in diverting this client to LP, Assured would suffer a loss of **$11,173.77** in annual revenue.

FISHER & PHILLIPS LLP
300 S Fourth Street, Suite 1500
Las Vegas, Nevada 89101

101.   ***The Broker of Records Arrive Immediately.*** A broker-of-record ("BOR") letter is an appointment letter used in the insurance industry to inform insurance carriers of an applicant's or insured's designation of an insurance broker to act on its behalf. It is typically used to signal the appointment of a broker for the first time or to replace an existing broker of record with a new one. When an insurance brokerage receives a broker-of-record letter reflecting the new appointment of a different insurance broker on behalf of an existing client, it informs the brokerage of the transfer/loss of business.

102.   Since September 20, 2021, Assured has either received or is aware of three BOR letters reflecting the transfer of three Assured accounts to LP that were previously managed by one or more of the Former Employee Defendants. Assured's total loss of annual revenue on these clients is approximately $62,000. Assured is also aware of three clients that Defendants have diverted to LP for which the BOR letter has not yet been received. Assured's total loss of annual revenue on these BOR-pending clients is over $82,000, bringing the total annual revenue loss to over **$144,000**. This, of course, does not account for the "dozen or so" LP claims to be holding onto until Assured responds to LP's demand to negotiate a book purchase.

### G.   The Former Employee Defendants Misappropriated Assured's Trade Secrets and Confidential Information

103.   Assured's investigation is ongoing, but as of the time of filing this Complaint, Assured is aware of the following acts whereby the Former Employee Defendants took with them Assured Trade Secrets and Confidential Information:

a.   On July 6, and August 5-9, 2021, Pino connected a USB device – which has not been returned – to her Assured-issued computer and, while it was connected, she saved to it, and accessed from it, file folders containing Assured's Trade Secrets and Confidential Information. Upon information and belief, such files include: client lists identifying the lead and service producers, estimated annual revenue; Pino's own client lists with status notes and renewal dates; an excel spreadsheet with filename

FISHER & PHILLIPS LLP
300 S Fourth Street, Suite 1500
Las Vegas, Nevada 89101

FP 41811252.1

"2020 Active Prospects" and other prospect lists for recent years; a chart listing client names, number of employees, renewal dates and revenue amounts, and key contact information with names, email addresses, and telephone numbers; a file containing contact information for specific insurance carrier representatives, commission information, "top client" reports and, "prospect" reports; and recent activity reports of what's in the pipeline. Upon information and belief, this USB device contained 30 folders filled with 242 files as of August 7, 2021.

       b.    On August 7, 2021, DeHart connected a USB device – which has not been returned – to her Assured-issued computer and, while it was connected, she saved to it, and accessed from it, file folders containing copious amounts of Assured's Trade Secrets and Confidential Information. These file folders appear to include, for example, client lists with sensitive client information, prospecting lists, sales data, and other client-related data. Upon information and belief, this USB device contained 43 folders filled with 466 files as of August 7, 2021.

       c.    On August 30, 2021, DeHart forwarded to her personal email, [deannakdehart@gmail.com](mailto:deannakdehart@gmail.com), a file containing a PowerPoint slide named, "Key Discoveries AAI.pptx," and it contains Assured's proprietary information that is part of the highly valuable blueprint proposal Assured used to present to a prospective client. It is surprising that DeHart would forward Assured proprietary information to her personal email address, as DeHart had previously emphasized to an Assured manager that "I have [a personal email address] but I don't use it."

       d.    On September 20, 2021, *after* she had resigned from Assured, Piatt connected a USB device and, while the device was inserted, Piatt accessed files from Assured's shared network drive that contain Assured's Trade Secrets and Confidential Information. Less than five minutes before the USB device was plugged into the computer, Piatt was accessing documents related to specific clients that contain Assured's Trade Secrets and/or Confidential Information.

FISHER & PHILLIPS LLP
300 S Fourth Street, Suite 1500
Las Vegas, Nevada 89101

FISHER & PHILLIPS LLP
300 S Fourth Street, Suite 1500
Las Vegas, Nevada 89101

e.       Then on September 21, 2021, Piatt connected the same USB device noted above for six minutes, during which time Piatt saved additional forms that appear to contain insurance rates and client elections and enrollment data – again, all constituting Assured's Trade Secrets and/or Confidential Information.

f.       The Former Employee Defendants all used their personal cell phones for business communications, whether phone calls or text messages, with clients, prospective employees, and third parties. The Former Employee Defendants were required to follow specific policies in the Employee Handbook pertaining to use of such devices. Based on Assured's policies and the Agreements signed by the Former Employee Defendants, all contact information and communications with clients remain the property of Assured regardless of where such information is stored by the employees, including on any personal device they used for work purposes. The Former Employee Defendants have improperly retained on their personal cell phones the names and contact information of many of Assured's clients and prospects, which includes direct contact information that is not readily available on the Internet or other sources. The have also improperly retained text messages they previously exchanged on Assured's behalf with clients and prospects. All this sensitive and valuable information remains in the possession of the Former Employee Defendants.

104.     The Former Employee Defendants have not only improperly acquired and retained Assured's Trade Secrets and Confidential Information as alleged above, but they have also used this information to solicit and do business with clients for the benefit of LP. The following are ways in which the Former Employee Defendants have improperly used Assured's Trade Secrets and Confidential Information.

a.       As stated, as of the time of the filing of this Complaint, Assured is aware of four Assured clients that have transferred their business to LP. The speed of this transfer could not have been accomplished without the misuse of Assured's Trade Secrets and Confidential Information and the breach of the Former Employee Defendants' fiduciary duties, particularly where the process of soliciting and diverting the client to

LP commenced while the Former Employee Defendants were still employed by Assured. For example, Assured received one BOR notification two days before DeHart resigned and another BOR notification the day that DeHart, Pino, and Warner resigned. The process of having a BOR issued to a client for signature and then processed through the insurance carrier typically takes several business days at a minimum, and sometimes more than a week or two. It is impossible for BORs to have been processed on DeHart's first day of employment with LP and in the days that follow without DeHart initiating the process with the client while she was still employed by Assured. DeHart caused clients to switch their business to LP before she submitted her resignation to Assured.

b.      Assured has alleged above several instances of meetings or communications that DeHart, Pino, and Warner have had with Assured clients after they resigned. These meetings and communications could not have occurred without the misuse of Assured's Trade Secrets and Confidential Information, including at a minimum the identities of the key client contacts, their direct contact information, and the data and proposals needed to drive that relationship and upcoming renewal forward.

c.      For at least one client DeHart has successfully diverted to LP, to facilitate the client's onboarding into LP's system for employee benefits, all that DeHart asked the client by email to provide was a copy of recent invoices from each insurance carrier. The reality is that it is burdensome for any client to move their employee benefits policies to another broker; it is not a quick and simple as providing a couple of invoices from carriers. The client would typically have to provide the new broker a lot of detailed information, including all their employee data, census, loss runs, and other information that the broker would have to enter. DeHart did not ask this client for any of that information, as that could impose burdens on the client of having to go through this process with another broker all over again. Unless this client provides DeHart all that detail, the only possible conclusion is that DeHart stole all this information from Assured and is using it to make this a hassle-free transition for the client.

FISHER & PHILLIPS LLP
300 S Fourth Street, Suite 1500
Las Vegas, Nevada 89101

FISHER & PHILLIPS LLP
300 S Fourth Street, Suite 1500
Las Vegas, Nevada 89101

**H.** **Assured Will Suffer Irreparable Harm Unless Defendants Are Enjoined**

105.     As a result of the Defendants' unlawful scheme, Assured has suffered and will continue to suffer irreparable harm and damages.

106.     The clock cannot be turned back to undo the damage to Assured caused by the Former Employee Defendants and their new employer, LP. Assured has already lost business from clients who agreed to transfer their business to Defendants. The damage caused to Assured's relationship with these clients is irreparable beyond the loss of revenue. With every BOR letter, and even every attempt by Defendants to solicit Assured clients in breach of the Agreements and to use Assured's Trade Secrets for their benefit, Assured suffers reputational damage and loss of goodwill with clients caused by out-of-control former employees, and loss of the client relationships that Assured developed over time and with substantial efforts.

107.     The Former Employee Defendants continue to have in their possession information and files they agreed are Assured's Trade Secrets and Confidential Information. This includes not just the files copied to USB devices and never returned, but also all the Assured data that the Former Employee Defendants have retained on their personal cell phones without authorization, including the names and contact information of clients and prospective clients with whom they had significant contact as part of their job duties at Assured, and including text messages with clients and other client-related notes they may have kept on their personal cell phones. The Former Employee Defendants' possession of all this information is particularly problematic because they are now employed by a competitor of Assured in the same type of position they were employed in at Assured and targeting the same clients for the same services.

108.     Assured faces imminent irreparable harm with every minute, hour and day the Defendants are soliciting and diverting Assured clients to AP. Defendants have made clear their plan to go after Assured's clients. Indeed, on Monday September 27, 2021, less than three business days after the mass resignation by the Former Employee

1   Defendants, Cushard sent Caparso an email seeking to justify their orchestration of this

2   mass defection, noting that "**many clients**" are moving their business to LP, and claiming

3   to be "**holding a dozen or so of these BORs** *as a courtesy*." A true and correct copy of

4   this email is attached hereto as **Exhibit 12**.

5       109.    Based on the average revenue on client accounts, Cushard's September

6   27 email is tantamount to a ransom note threatening to transfer a dozen clients or

7   potentially hundreds of thousands of dollars in business to LP and irreparably destroy the

8   goodwill that Assured had developed with its clients. It is also an attempt to paint a false

9   narrative of five employees making an "independent choice" to all leave Assured and

10  join LP at the same time and of "many clients" jumping at the opportunity to do business

11  with them at LP. Contrary to these false narratives, the evidence shows that the Former

12  Employee Defendants and LP conspired to exert maximum damage on Assured by

13  coordinating the Former Employee Defendants' defection from Assured, stealing the

14  playbook of Assured's Trade Secrets and Confidential Information, soliciting and

15  beginning to divert clients to LP even before their resignations from Assured, soliciting

16  Assured clients after joining LP, and proceeding to onboard Assured clients with LP

17  using the information and documents they stole from Assured.

18              ## COUNT 1
                ### BREACH OF CONTRACT
19              **(As Against the Former Employee Defendants)**

20      110.    Plaintiff incorporates by reference paragraphs 1 through 109 of this

21  Complaint as if fully set forth herein.

22      111.    As a condition of the commencement of their employment with Plaintiff,

23  the Former Employee Defendants all executed the Agreements. See Exhibits 2-6.

24      112.    The Agreements are valid and enforceable contracts requiring the Former

25  Employee Defendants to, neither directly nor indirectly through another person or entity:

26              a.    not use or disclose to any third party, any Confidential Information

27                   for any reason other than as intended within the scope of

28

FISHER & PHILLIPS LLP
300 S Fourth Street, Suite 1500
Las Vegas, Nevada 89101

FP 41811252.1

employment with Assured or as approved by an Assured executive officer;

b.    offer, sell, solicit, quote, place, provide, renew, or service any insurance product or service to, or on behalf of, any "Restricted Clients" – a term defined to include: (i) Assured clients during the two years preceding the employee's separation date as to which the employee either had some involvement in proposing, selling, quoting, placing, providing, servicing, or renewing any insurance product or service of about whom the employee received Confidential Information within two years prior to the employee's separation date, and (ii)_Assured prospective clients during the during years preceding the employee's separation date as to which the employee had involvement in proposing, quoting, placing, providing, servicing, or renewing any insurance product or service or about whom employee received Confidential Information;

c.    take any action intended, or reasonably likely, to cause any vendor, insurance carrier, wholesale broker, Restricted Client, other client of the Company, or any other third part with a material business relationship with the Company to cease or refraining from doing business with the Company; and

d.    solicit, hire, engage, or seek to induce any of the Company's employees to terminate such employee's employment with the Company for any reason, including, without limitation, to work for Employee or a competitor of the Company.

113.    In the Agreements, the Former Employee Defendants each consented to the entry of injunctive relief in the event that they breached their contractual obligations.

114.    Assured has met all of its obligations to the Former Employee Defendants under the Agreements.

FP 41811252.1

FISHER & PHILLIPS LLP
300 S Fourth Street, Suite 1500
Las Vegas, Nevada 89101

FISHER & PHILLIPS LLP
300 S Fourth Street, Suite 1500
Las Vegas, Nevada 89101

115.   By the actions alleged above each of the Former Employee Defendants have breached, and plan to breach the Agreements by: (a) retaining, using, and/or disclosing Assured's Trade Secrets and Confidential Information; (b) participating in a scheme to move Assured's clients to LP in violation of their restrictions against soliciting or servicing certain Assured's clients; (c) participating in a scheme to move the Former Employee Defendants and at least one other Assured employee to LP by directly or indirectly soliciting those employees; and/or (d) soliciting and doing business with Assured's clients in violation of the Agreements.

116.   The Former Employee Defendants' actions constitute a breach of their Agreements with Assured.

117.   As a direct and proximate result of the Former Employee Defendants' actions in breach of the Agreement, Assured has sustained and/or will sustain damages and is faced with irreparable harm such that injunctive relief is appropriate.

118.   Pursuant to the terms of the Agreements, Assured is entitled to recover its attorneys' fees incurred in this action.

## COUNT 2
### TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
### (As Against LP)

119.   Plaintiff incorporates by reference paragraphs 1 through 118 of this Complaint as if fully set forth herein.

120.   As a condition of the commencement of their employment with Assured, the Former Employee Defendants all executed the Agreements. See Exhibits 2-6.

121.   The Agreements are valid and enforceable contracts requiring the Former Employee Defendants to, neither directly nor indirectly through another person or entity:

a.   not use or disclose to any third party, any Confidential Information for any reason other than as intended within the scope of employment with Assured or as approved by an Assured executive officer;

b.    offer, sell, solicit, quote, place, provide, renew, or service any insurance product or service to,  or on behalf of, any "Restricted Clients" – a term defined to include: (i) Assured clients during the two years preceding the employee's separation date as to which the employee either had some involvement in proposing, selling, quoting, placing, providing, servicing, or renewing any insurance product or service of about whom the employee received Confidential Information within two years prior to the employee's separation date, and (ii)_Assured prospective clients during the during years preceding the employee's separation date as to which the employee had involvement in proposing, quoting, placing, providing, servicing, or renewing any insurance product or service or about whom employee received Confidential Information;

c.    take any action intended, or reasonably likely, to cause any vendor, insurance carrier, wholesale broker, Restricted Client, other client of the Company, or any other third part with a material business relationship with the Company to cease or refraining from doing business with the Company; and

d.    solicit, hire, engage, or seek to induce any of the Company's employees to terminate such employee's employment with the Company for any reason, including, without limitation, to work for Employee or a competitor of the Company.

122.    Upon information and belief, LP was aware of or should have known of the existence of the Agreements between the Former Employee Defendants and Assured.

123.    By concocting and participating in a scheme with the Former Employee Defendants to move the Former Employee Defendants and the clients that they serviced over to LP through the misuse of Assured's Trade Secrets and Confidential Information,

LP intentionally interfered with the Agreements between the Former Employee Defendants and Assured.

124.    LP had no justification for its intentional interference with the Agreements between Assured and the Former Employee Defendants.

125.    As a direct and proximate result of the actions of LP, Assured has sustained and/or will suffer damages.

126.    The conduct of LP, as alleged in Count 2, was willful and malicious and demonstrates a complete indifference to or a conscious disregard for the rights of Assured, entitling Assured to an award of punitive damages.

## COUNT 3
**MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF THE DEFEND TRADE SECRETS ACT (18 U.S.C. § 1831 *et seq.*)**
**(As Against all Defendants)**

127.    Plaintiff incorporates by reference paragraphs 1 through 126 of this Complaint as if fully set forth herein.

128.    The financial and business information and files misappropriated by the Defendants are trade secrets of Assured and subject to protection under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831 et seq.

129.    The information misappropriated by the Defendants is valuable because it is not generally known or readily accessible, through proper means, to others who can profit from its use. Assured has spent significant sums, in terms of both financial and human resources, to develop and maintain this information, which would be of great value to any competitor.

130.    The information misappropriated by the Defendants is related to products or services used in, or intended for use in, interstate commerce, including but not limited to commercial insurance policy information.

131.    Assured takes and, at all times relevant hereto, has taken reasonable measures to maintain the confidential and secret nature of this information. Those steps include: (a) handbook and IT policies; (b) restricting availability of certain confidential

FISHER & PHILLIPS LLP
300 S Fourth Street, Suite 1500
Las Vegas, Nevada 89101

FP 41811252.1

information to key employees; (c) requiring employees to execute agreements with confidentiality provisions and restrictive covenants; (d) physical security measures to protect against the disclosure of sensitive materials to third parties; and (e) IT security measures, such as password protection for all computers and segregation of certain files so that only employees with a need to access the files can do so.

132.   Defendants obtained the information at issue by improper means in violation of their contractual and other obligations to Assured, including, but not limited to, e-mailing the information to personal email accounts, copying files to external USB hard drives, and/or retaining information on their personal cell phones containing client preferences, contacts, and other Trade Secrets.

133.   Defendants' foregoing conduct constitutes an actual and threatened misappropriation and misuse of Assured's trade secret information in violation of the DTSA.

134.   Upon information and belief, and as Assured expects to establish on further investigation and discovery, the Former Employee Defendants improperly retained, used, and/or disclosed (and continue to retain, use, and/or disclose) to LP the confidential business information with which they worked when they were employed by Assured. Additionally, LP conspired with and/or solicited the Former Employee Defendants to appropriate the confidential and trade secret business information of Assured and use it, and/or allowed it to be used to LP's economic benefit.

135.   The Former Employee Defendants engaged in this conduct despite acquiring this information under circumstances giving rise to a duty to maintain the information's secrecy and limit its use, which duty the Former Employee Defendants owed and continue to owe Assured as former agents, employees and representatives of Assured. Upon information and belief, and as Assured expects to establish on further investigation and discovery, LP knew the information was confidential and trade secret information belonging to Assured and LP knew of Assured's Agreements (containing requirements that Former Employee Defendants maintain the secrecy of the information).

FISHER & PHILLIPS LLP
300 S Fourth Street, Suite 1500
Las Vegas, Nevada 89101

FP 41811252.1

136.   As a direct and proximate result of Defendants' actual and threatened misappropriation of Assured's trade secrets, Assured has suffered irreparable harm and will continue to suffer irreparable harm that cannot be adequately remedied at law unless he is enjoined from engaging in any further acts of misappropriation and from continued possession in any form of trade secret information belonging to Assured.

137.   As a direct and proximate result of Defendants' misappropriation, Assured has suffered and/or will suffer damages and irreparable harm, and is entitled to all damages, attorneys' fees, costs and remedies permitted under the DTSA.

138.   Each of the acts of misappropriation, as alleged in Count 3, was done maliciously by Defendants, thereby entitling Assured to exemplary damages to be proved at trial.

139.   Each of the acts of misappropriation, as alleged in Count 3, was malicious, fraudulent, deliberate and willful, as revealed by Defendants' conduct described above. Assured is therefore entitled to recover from Defendants exemplary damages in an amount twice the total of the damages recovered for actual loss as permitted by 18 U.S.C. § 1836(b)(3)(C), and exemplary damages to be proved at trial.

140.   Assured is entitled to an award of attorneys' fees pursuant to 18 U.S.C. §1836(b)(3)(D).

**COUNT 4**
**MISAPPROPRIATION OF TRADE SECRETS**
**(NRS 600A.010 ET SEQ.)**
**(As Against all Defendants)**

141.   Plaintiff incorporates by reference paragraphs 1 through 140 of this Complaint as if fully set forth herein.

142.   The information and files misappropriated by the Defendants are trade secrets of Assured and subject to protection under Nev. Rev. Stat. 600A.010 *et seq.*

143.   The information misappropriated by the Defendants is valuable because it is not generally known or readily accessible, through proper means, to others who can profit from its use. Assured has spent significant sums, in terms of both financial and

FISHER & PHILLIPS LLP
300 S Fourth Street, Suite 1500
Las Vegas, Nevada 89101

FISHER & PHILLIPS LLP
300 S Fourth Street, Suite 1500
Las Vegas, Nevada 89101

human resources, to develop and maintain this information, which would be of great value to any competitor.

144.    Assured takes and, at all times relevant hereto, has taken reasonable measures to maintain the confidential and secret nature of this information. Those steps include: (a) handbook and IT policies; (b) restricting availability of certain confidential information to key employees; (c) requiring employees to execute agreements with confidentiality provisions and restrictive covenants; (d) physical security measures to protect against the disclosure of sensitive materials to third parties; and (e) IT security measures, such as password protection for all computers and segregation of certain files so that only employees with a need to access the files can do so.

145.    Defendants obtained the information at issue by improper means in violation of their contractual and other obligations to Assured, including, but not limited to, e-mailing the information to personal email accounts, copying files to external USB hard drives, and/or retaining information on their personal cell phones containing client preferences, contacts, and other Trade Secrets.

146.    Defendants' foregoing conduct constitutes an actual and threatened misappropriation and misuse of Assured's trade secret information in violation of Nev. Rev. Stat. 600A.010 *et seq.*

147.    Upon information and belief, and as Assured expects to establish on further investigation and discovery, the Former Employee Defendants improperly retained, used, and/or disclosed (and continue to retain, use, and/or disclose) to LP the confidential business information with which they worked when they were employed by Assured. Additionally, LP conspired with and/or solicited the Former Employee Defendants to appropriate the confidential and trade secret business information of Assured and use it, and/or allowed it to be used to LP's economic benefit.

148.    The Former Employee Defendants engaged in this conduct despite acquiring this information under circumstances giving rise to a duty to maintain the information's secrecy and limit its use, which duty the Former Employee Defendants

- 43 -

FISHER & PHILLIPS LLP
300 S Fourth Street, Suite 1500
Las Vegas, Nevada 89101

owed and continue to owe Assured as former agents, employees and representatives of Assured. Additionally, LP knew or had reason to know that its knowledge of the trade secret was derived from or through a person who had used improper means to acquire it; acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or derived from or through a person who owed a duty to Assured to maintain its secrecy or limit its use.

149.    As a direct and proximate result of Defendants' actual and threatened misappropriation of Assured's trade secrets, Assured has suffered irreparable harm and will continue to suffer irreparable harm that cannot be adequately remedied at law unless he is enjoined from engaging in any further acts of misappropriation and from continued possession in any form of trade secret information belonging to Assured.

150.    As a direct and proximate result of Defendants' misappropriation, Assured has suffered and/or will suffer damages and irreparable harm, and is entitled to all damages, attorneys' fees, costs and remedies permitted under Nevada Law.

151.    Each of the acts of misappropriation, as alleged in Count 4, was done maliciously by Defendants, thereby entitling Assured to exemplary damages to be proved at trial.

152.    Each of the acts of misappropriation, as alleged in Count 4, was malicious, fraudulent, deliberate and willful, as revealed by Defendants' conduct described above. Assured is therefore entitled to recover from Defendants exemplary damages in an amount twice the total of the damages recovered for actual loss as permitted by NRS § 600A.050 and exemplary damages to be proved at trial.

153.    Assured is entitled to an award of attorneys' fees pursuant to NRS § 600A.060(3) and any other applicable statute or law.

## COUNT 5
### BREACH OF FIDUCIARY DUTY
### (As Against the Former Employee Defendants)

154.    Plaintiff incorporates by reference paragraphs 1 through 153 of this Complaint as if fully set forth herein.

FP 41811252.1

155.    By virtue of their status as client-facing employees of Assured responsible for developing and maintaining Assured's goodwill and relationships with clients, the Former Employee Defendants operated as fiduciaries with respect to Assured's business and owed Assured the fiduciary duties of loyalty and care and were required to keep the confidential and business secrets of Assured inviolate.

156.    The Former Employee Defendants breached their fiduciary duty to Assured by engaging in misconduct that served their own self-interest and the interests of others rather than the interests of Assured and have acted in a manner inconsistent with the best interests of Assured – to wit, facilitating the movement of several key insurance producers and account managers from Assured to LP, causing LP to solicit the other Former Employee Defendants, and planning to migrate the clients serviced by the Former Employee Defendants to LP while depriving Assured of the ability to retain the business of those clients.

157.    Upon information and belief, DeHart breached her fiduciary duty by leading Assured to believe she was taking a day off to be with family for the two business days preceding the day she intended to resign, when, in fact, she surreptitiously had planned to, and did, meet with at least two Assured clients day before she quit for the purpose of soliciting their business to follow her to LP.

158.    Further, DeHart, Pino, and Warner breached their fiduciary duties by failing to provide Assured any advance notice of their resignations, and instead resigning "effective immediately." Upon information and belief, DeHart, Pino, and Warner had accepted positions at LP well in advance of their no-notice resignation dates. By providing Assured no notice of their resignations, DeHart, Pino and Warner deprived Assured of opportunity to reassign those Assured accounts to other Assured producers. Undoubtedly, DeHart, Pino and Warner intentionally withheld their resignation notices for the purpose of helping secure the unlawful transfer of business to LP.

159.    In addition, the Former Employee Defendants breached their duties of loyalty by soliciting clients for the benefit of LP while still employed by Assured.

Assured received one BOR notification two days before DeHart resigned and another BOR notification the day that DeHart, Pino, and Warner resigned. The process of having a BOR issued to a client for signature and then processed through the insurance carrier typically takes several business days at a minimum, and sometimes more than a week or two. It was impossible for BORs to have been processed on DeHart's first day of employment with LP and in the days that follow without DeHart initiating the process with the client while she was still employed by Assured. DeHart caused clients to switch their business to LP before she submitted her resignation to Assured.

160.    In addition, DeHart, Pino, and Piatt breached their fiduciary duties by stealing Assured Trade Secrets and Confidential Information while fiduciaries to Assured, including their unlawful downloading to USB devices over 700 files and forwarding confidential information to personal email addresses.

161.    As a direct and proximate result of the Former Employee Defendants' breaches of fiduciary duties, Assured has incurred damages.

162.    The actions of the Former Employee Defendants in Count 4, were willful and malicious and demonstrate a complete indifference to or a conscious disregard for the rights of Assured, entitling Assured to punitive damages.

**COUNT 6**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
**(As Against LP)**

163.    Plaintiff incorporates by reference paragraphs 1 through 162 of this Complaint as if fully set forth herein.

164.    At all times alleged herein, LP knew that the Former Employee Defendants owed duties of loyalty to Assured through their respective last dates of employment with Assured.

165.    At all times alleged herein, upon information and belief, LP was aware of Former Employee Defendants' conduct alleged above.

FISHER & PHILLIPS LLP
300 S Fourth Street, Suite 1500
Las Vegas, Nevada 89101

FP 41811252.1

166.    At all times alleged herein, upon information and belief, LP knew that the Former Employee Defendants' conduct alleged above constituted a breach of their duties of loyalty owed to Assured.

167.    Upon information and belief, at all times alleged herein, LP knowingly permitted, authorized, and ratified the Former Employee Defendants' conduct alleged above to accomplish the unlawful results alleged above.

168.    LP's conduct in aiding and abetting the above-alleged breaches by the Former Employee Defendants of their duties of loyalty were substantial factors in causing the harm suffered by Assured.

169.    LP knowingly and substantially participated, aided, and abetted the above-alleged breaches of duties of loyalty committed by the Former Employee Defendants.

170.    As a direct and proximate result of LP's aiding and abetting the Former Employee Defendants' breaches of fiduciary duties, Assured has incurred damages.

171.    The actions of LP in Count 5, were willful and malicious and demonstrate a complete indifference to or a conscious disregard for the rights of Assured, entitling Assured to punitive damages.

### COUNT 7
#### UNJUST ENRICHMENT
#### (As to All Defendants)

172.    Plaintiff incorporates by reference paragraphs 1 through 171 of this Complaint as if fully set forth herein.

173.    As a result of their misconduct as alleged in this Complaint, Defendants have been unjustly enriched or will be unjustly enriched through the misuse of Assured's confidential, proprietary and trade secret information, which has allowed them to avoid developing LP's own confidential and proprietary information and, upon information and belief, to unlawfully solicit and convert Assured's customers to LP.

FISHER & PHILLIPS LLP
300 S Fourth Street, Suite 1500
Las Vegas, Nevada 89101

FP 41811252.1

174.    The retention of these benefits by Defendants under the circumstances is inequitable and, therefore, Defendants should be required to disgorge their wrongful gains.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff AssuredPartners of Nevada, LLC requests that this Court provide it with injunctive relief and money damages against Defendants LP Insurance Services, LLC; Deanna DeHart; Gigi Bradley; Heather Piatt; Bryce Warner and Courtney Pino in the following forms:

1.    Preliminary and permanent injunctive relief, including a preliminary injunction prohibiting the Former Employee Defendants from:

    a.    violating the terms and restrictions set forth in their Agreements with Assured;

    b.    directly or indirectly through another person or entity, offering, selling, soliciting, quoting, placing providing, renewing, or servicing any insurance product to, or on behalf of any "Restrict Client" – a term defined to include:

        i.    any client of Assured during the two (2) years immediately preceding the date upon which the Employee's employment with the Company ends for any reason (the "Separation Date") as to which the Employee either had some involvement in proposing, selling, quoting, placing, providing, servicing, or renewing any insurance product or service or about whom the Employee received Confidential Information; and

        ii.    any prospective client of Assured within two (2) years immediately preceding the Separate Date as to which employee had involvement in proposing, selling, quoting, placing, providing, servicing, or renewing any insurance

FISHER & PHILLIPS LLP
300 S Fourth Street, Suite 1500
Las Vegas, Nevada 89101

1  product or service or about whom Employee received

2  Confidential Information.

3  c.  directly or indirectly through another person or entity, taking any

4  action intended, or reasonably likely, to cause any vendor,

5  insurance carrier, wholesale broker, Restricted Client, other client

6  of Assured, or any other third part with a material business

7  relationship with Assured to cease or refraining from doing

8  business with Assured; or

9  d.  directly or indirectly through another person or entity, soliciting,

10  hiring, engaging, or seeking to induce any of the Company's

11  employees to terminate such employee's employment with

12  Assured for any reason, including, without limitation, to work for

13  employee or a competitor of Assured;

14  e.  retaining Assured's Trade Secrets or Confidential Information;

15  f.  misappropriating, using and/or disclosing Assured's Trade Secrets

16  and/or Confidential Information in violation of the confidentiality

17  covenants in their respective Agreements with Assured.

18  2.  The entry of a preliminary and permanent injunction enjoining all

19  Defendants from:

20  a.  accessing, misappropriating, using, utilizing and/or disclosing

21  Assured's Confidential and/or Trade Secret Information;

22  b.  altering or deleting information contained on any computers,

23  phones or devices in their possession and/or control pertaining to

24  Assured, constituting Assured's information or data, or which

25  relates to the Assured's business;

26  c.  engaging in unlawful, unfair, and fraudulent business practices,

27  including intentional interference with Plaintiff's business

28

FISHER & PHILLIPS LLP
300 S Fourth Street, Suite 1500
Las Vegas, Nevada 89101

1   relationships and contracts with their customers and other third

2   parties;

3       d.    Soliciting current customers of Assured; and

4       e.    profiting or benefiting from their wrongful conduct.

5       3.    The entry of an order requiring Defendants to immediately return to

6   Assured any and all property, data and information belonging to Assured, including but

7   not limited to Trade Secrets and Confidential Information, and an order prohibiting any

8   further use or benefit from the use of said information.

9       4.    The entry of an order requiring Defendants to inform Plaintiff and the

10   Court of all clients and prospective clients of Assured that any Defendants contacted or

11   solicited.

12       5.    The entry of an order requiring Defendants to inform Plaintiff and the

13   Court of all clients and prospective clients of Assured that any Defendants contacted or

14   solicited using Assured's Confidential Information and/or Trade Secrets.

15       6.    The entry of an order that Defendants cease soliciting Assured's clients,

16   with the duration of said enforcement order to begin upon entry of judgment in this action

17   as the duration of the covenant that was tolled by Defendants' prior and continuing

18   breaches.

19       7.    The entry of a judgment in favor of Plaintiff and against all Defendants.

20       8.    The entry of a judgment for all actual and consequential damages flowing

21   from Defendants' unlawful actions, jointly and severally, in an amount in excess of

22   $75,000.00.

23       9.    An award of all costs and disbursements of this action, including

24   reasonable attorneys' fees, costs, and expenses, in excess of $75,000.00.

25       10.    Exemplary and/or double damages, including but not limited to those

26   provided by statutes.

27       11.    Punitive and/or treble damages, including but not limited to those

28   provided by statutes.

FISHER & PHILLIPS LLP
300 S Fourth Street, Suite 1500
Las Vegas, Nevada 89101

FP 41811252.1

12.     Pre-trial and post-trial judgment interest.

13.     An accounting and disgorgement of any profits or monetary benefits obtained by Defendants as a result of their unlawful activities.

14.     An award of such other relief as this honorable Court may deem just and proper.

Dated this 28th day of September, 2021.

FISHER & PHILLIPS LLP


By:   /s/ *Allison L. Kheel, Esq.*
ALLISON L. KHEEL, ESQ.
300 S. Fourth Street
Suite 1500
Las Vegas, NV 89101

USAMA KAHF, ESQ. (pending *pro hac vice*)
2050 Main Street
Suite 1000
Irvine, CA 92614
*Attorneys for Plaintiff*

FP 41811252.1